*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

### DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CV-0739

JEAN R. BROOKS, *et al.*, APPELLANTS,

V.

MITSUBISHI ELECTRIC AND ELECTRONICS USA, INC., *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2012-CA-003241-B)

(Alfred S. Irving, Jr., *Judge*)

(Argued April 14, 2026            Decided July 16, 2026)

*Jesenka Mrdjenovic* argued for appellants.

*Terrence J. Dee* argued for appellees.

Many additional counsel were on the briefs for the parties. Their names are listed in an appendix to this opinion.

Before EASTERLY and SHANKER, *Associate Judges*, and THOMPSON, *Senior Judge*.

Opinion for the court by *Associate Judge* Easterly.

Dissenting opinion by *Senior Judge* THOMPSON at page 49.

EASTERLY, *Associate Judge*: For a quarter of a century, the same collection of plaintiffs' lawyers has been trying to hold the same collection of defendant cellphone

companies liable for injuries that an ever-expanding group of complainants allegedly suffered as a result of cellphone radiation exposure. This court has already decided three appeals in these cases. In *Murray v. Motorola*, *Inc.*, 982 A.2d 764, 768, 778-89 (D.C. 2009) (*Motorola I*), we held that six complaints filed in 2001 and 2002 by plaintiffs who were either individuals suffering from brain tumors or estates suing on behalf of decedents who had died from brain tumors were not wholly preempted by federal law. Litigation of these cases—at some point consolidated with another eight complaints to become the *Murray* cases—proceeded until the defendants appealed from an adverse-in-part *Frye*/*Dyas* ruling. In *Motorola v. Murray*, 147 A.3d 751, 752, 756-57, 759 (D.C. 2016) (en banc) (*Motorola II*), we retired the standard for the admission of expert testimony under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and *Dyas v. United States*, 376 A.2d 827 (D.C. 1977), and adopted the standard set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702; we then remanded for the *Murray* plaintiffs to litigate the admissibility of their proffered expert testimony under *Daubert*/Rule 702. In *Murray v. Motorola*, 339 A.3d 152, 156, 174 (D.C. 2025) (*Motorola III*), we upheld the trial court's ruling excluding the *Murray* plaintiffs' proffered expert testimony under *Daubert*/Rule 702. In so doing we affirmed the court's decisions denying the *Murray* plaintiffs' motions for additional discovery and new experts and striking portions of their expert reports. *Id*. at 169-74.

Now, in this fourth related appeal, we consider whether the trial court correctly determined that the *Brooks* plaintiffs—another group of complainants who shared the same counsel as the *Murray* plaintiffs and whose eighteen later-filed complaints were eventually separately consolidated—were bound by litigation regarding whether the *Murray* plaintiffs' experts could testify about "general causation," i.e., the causal connection between radiation from cellphones and the type of adverse health effects at issue in the *Murray* (and *Brooks*) cases. We conclude that the *Brooks* plaintiffs agreed—either expressly or implicitly—to be bound by both the substantive outcome of the *Murray* litigation and all predicate procedural rulings, and we discern no basis to declare those agreements nonbinding. Because the testimony of the *Murray* plaintiffs' experts was deemed inadmissible, we affirm the trial court's decision to grant the defendant cellphone companies summary judgment on the ground that the *Brooks* plaintiffs lacked the requisite expert testimony to prove their case.

## I.     Procedural History

### A. The Initial Case Management Order in the *Murray* Cases

We begin our recap of the procedural history with the bifurcation of the litigation in the *Murray* cases in the trial court's initial case management order and the contemporaneous litigation about the order's meaning.

On November 15, 2011, the presiding judge, Judge A. Franklin Burgess, Jr., held a case management hearing in the *Murray* cases. At the hearing, the plaintiffs suggested an alternative to "full discovery . . . [in] 14 cases" on overlapping issues and proposed that the trial court focus first on determining whether plaintiffs had admissible expert testimony regarding the "general causation" question that pertained to all of the plaintiffs—i.e., whether their experts could permissibly testify that cellphone radiation causes the type of adverse health effects the plaintiffs had experienced. The plaintiffs asserted that their suggested approach would be "efficient" because the expert testimony issue could be dispositive: if the court determined their "experts' testimony [wa]s founded in science" and could be presented to a jury, their cases could move forward, but "[i]f the court says no, [the proffered expert] testimony is no good and strikes the witnesses, then most of this is over with." But even as the plaintiffs proposed to forgo "full blown discovery," at least at the outset of the case, as part of this plan, they indicated that they still wanted to get discovery seemingly unrelated to a *Frye*/*Dyas* hearing on the admissibility of their experts' testimony about general causation, noting, for example, their desire to obtain from defendants "internal correspondence between regulatory bodies and manufacturers, between manufacturers and the trade associations." For their part, the defendants did not oppose bifurcating the case; but highlighting that no plaintiff in these types of suits had ever "gotten an expert to a jury," they countered that

plaintiffs should be required to first demonstrate that they had admissible expert testimony as to both general causation and specific causation as to all the complainants diagnosed with brain cancer.

Putting forward his own bifurcation plan, Judge Burgess decided that the *Murray* plaintiffs would first address expert admissibility as to general causation with only limited discovery to that end. Under this plan, the parties would have:

> a *Frye* hearing directed toward and discovery direct[ed] toward whether there is some consensus among the scientific community that cellphone radiation can cause one of these four tumors or health effects as [plaintiffs] have defined it and that in order to do that, [plaintiffs] can have discovery directed toward that issue . . . but that will be the limit of the discovery at this point other than, of course, the deposition of the experts, all along toward trying to figure out whether [plaintiffs] can meet the *Frye* standard.

And Judge Burgess pushed back when plaintiffs' counsel tried to expand the boundaries of its ruling, stressing that "the issue [would] . . . be whether [plaintiffs' experts'] methodology [is] satisfactory under *Frye*," and thus that the defendants would have nothing to prove at this juncture. Ultimately, the *Murray* plaintiffs stated that they "underst[oo]d" that this plan would "have the efficiencies of" resolving "just the general causation issue under *Frye*, the methodology and qualifications of

our experts . . . after whatever briefing, expert reports being exchanged, limited discovery."[1]

In December 2011, Judge Burgess issued an Initial Case Management Schedule for Phase I Discovery memorializing its bifurcation plan in the *Murray* cases. The order stated in pertinent part:

> WHEREAS this court, having conducted a case management conference on November 15, 2011, having conducted oral argument, and having determined for the reasons stated on the record that the first phase of discovery shall focus on general causation; . . . .
>
> NOW, THEREFORE, the Court hereby ORDERS . . . that discovery in the above-referenced actions shall be limited to general causation plus certain other discovery may be requested to the extent noted and approved on the record during the November 15, 2011[,] hearing.

Judge Burgess then set out a schedule for the completion of "fact discovery related to general causation," the "[d]isclosure of [the parties'] experts and reports on general causation" following discovery that largely tracked the requirements of

---

[1] Judge Burgess did grant defendants' request to expand discovery to include plaintiffs' medical records, but he rejected as unnecessary their request to get product identification information (to enable the cellphone companies to determine if some of them could be dismissed because no plaintiff had ever used their products). In rejecting the defendants' request for this additional information, Judge Burgess explained to the defendants that "[t]he whole idea of the *Frye* hearing is to eliminate all issues, but that one. If I decide . . . in your favor in *Frye*, . . . [y]ou would be out of the case. You wouldn't have to do this discovery."

Federal Rule of Civil Procedure 26(a)(2)(B),[2] the completion of depositions of the experts, and the submission of "*Frye/Dyas* motions related to Plaintiffs' experts on general causation." The schedule contemplated a "*Frye/Dyas* Hearing on Defendants' motions" by July 2013.

Although general causation discovery was scheduled for completion by August 2012, the parties returned to court on the *Murray* plaintiffs' motion to compel in September 2012. The plaintiffs asserted that they had been unable to get the "fact discovery regarding general causation"—i.e., "whether cellphone radiation can cause the types of adverse health effects that [they had] alleged in their complaints"—to which they believed they were entitled. Among the discovery plaintiffs alleged was being withheld was defendants' "scientific studies, scientific data, test results and literature regarding cellphone radiation and the exposure and

---

[2] The order specifically required the expert reports to "include (i) a complete statement of all opinions the witness will express on general causation and the basis and reasons for them; (ii) facts or data considered by the expert in forming the opinions; (iii) the witness's qualifications, including a current CV; (iv) a list of all other cases in which the witness has testified in the previous four years; and (v) a statement of the compensation to be paid for the expert's work on the case." *See* Fed. Civ. Proc. R. 26(a)(2)(B) (requiring expert reports to contain "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the expert in forming them; . . . (iv) the witness's qualifications . . . ; (v) a list of all other cases in which . . . the witness has testified . . . ; [and] (vi) a statement of the compensation to be paid for the study and testimony in the case"). The analogous Superior Court rule was amended to track the federal rule in 2015. *Compare* Super. Ct. Civ. R. 26(a)(2)(B) (2015 ed.) *with generally* Super. Ct. Civ. R. 26 (2011 ed.).

the adverse health effects." The plaintiffs asserted they needed this information both because "general causation is cause and effect," and because their experts should be able to "take[] into account" defendants' "studies or literature or the test data." The plaintiffs also asserted that they only had "one shot at doing general causation fact discovery in this case."

Judge Burgess and the *Murray* plaintiffs then engaged in a lengthy exchange, spanning almost fifty pages of transcript, about whether the discovery the plaintiffs sought was contemplated by the Initial Case Management Order, or if not, whether the court should expand the scope of discovery. At the outset, the court stated that the plaintiffs had not been entitled, under the Initial Case Management Order, to broad discovery into whether the defendants possessed information showing cellphone radiation could cause cancer. Rather, in this first phase of discovery, the plaintiffs were entitled only to information that related to the admissibility of their experts' testimony about "general causation." Judge Burgess explained that "general causation . . . mean[s] . . . whether or not . . . the methodology is generally accepted to allow an opinion to state that cellphones cause injury. That is general causation." Judge Burgess told the plaintiffs to "keep in mind" that if their expert testimony about general causation was deemed admissible, then "we have full discovery" or at least "you get much fuller discovery of the defendants than you would get now." But

the debate about whether cellphones can cause adverse health effects, the court stated, was reserved for trial.[3]

The *Murray* plaintiffs admitted that they did not "need anything more" in the way of discovery to litigate admissibility of their experts' testimony regarding general causation; nonetheless, they pressed the court to adopt a broader conception of "general causation" discovery that would include, for example, any smoking gun-type evidence the defendants might have in their possession. The plaintiffs asserted that this would promote efficiency because "[i]f you just do discovery on a *Frye* hearing[] on methodology you are not done there, because you still have the cause

---

[3] At one point during this discussion, plaintiffs' counsel asserted that the *Murray* plaintiffs never would have "stipulated to th[e court's November 2011] order" had they understood they were limiting discovery solely to information relating to the admissibility of their experts' testimony about general causation. But at this juncture, the parties had not stipulated to anything, as Judge Burgess made clear when he responded that, although the *Murray* plaintiffs were the first to suggest bifurcation, "it was my ruling . . . I am the one that ultimately made the ruling." And to the extent the plaintiffs simply meant they never would have acceded to the court's bifurcation proposal had its terms been clear, the trial court was unconvinced, repeatedly noting that (1) he had "said . . . very clearly" at the November 2011 hearing that he was proposing "staged discovery, the first stage [of] discovery [to be] aimed toward a *Frye* hearing"; (2) he was "very firm in my opinion that [he] was directing this . . . discovery toward a *Frye* hearing"; (3) he had "made it clear that the first stage of the case would be a hearing to se[e] whether the plaintiffs could 'meet the *Frye* standard,'" quoting the November transcript; (4) although his order "did not mention general causation as determined under *Frye*, it [was] clear to [him] from what [he had] said at the [November 2011] hearing that that is the intent of the [Initial Case Management] order and it should be construed that way"; and (5) he had been "clear that we would be trying to 'figure out whether you, i.e., the plaintiffs can make the *Frye* standard,'" again quoting the November transcript.

and effect . . . We still have to convince the jury at the end of the day that the cause and effect is there." Judge Burgess was unmoved. He explained that, under the "clear" and "firm" terms of the bifurcation arrangement he had decided upon at the November 15, 2011, hearing as memorialized in the December 2011 Initial Case Management Schedule for Phase I Discovery, the "efficiency" to be gained was in determining whether the plaintiffs had the requisite expert testimony about general causation to allow their case to survive. To that end, the "first stage[ of] discovery [had been] aimed toward a *Frye* hearing" where the parties would focus on "the methodology, the method, technique, [or the] way of thinking . . . used to reach a conclusion by the plaintiffs' expert" to determine "is that generally accepted"— "nothing more."

For these reasons, Judge Burgess denied the *Murray* plaintiffs' motion to compel.[4] He explained that "Plaintiffs . . . operate from a mistaken premise if they argue or when they argue that general causation, as used in the court's order, addresses cause and effect, whether cellphones can cause adverse effects," and this "mistaken premise has led them down the path of discovery that is much too broad."

---

[4] Judge Burgess granted the plaintiffs relief in one respect: he ordered the defendants to supplement their production of completed studies with any "uncompleted studies, which [defendants] have conducted or which they control" because "[i]f, for example, defendants have conducted studies that use a methodology used by plaintiffs' expert, it should not matter . . . that defendants have not completed the study."

Acknowledging the plaintiffs' requests for internal documents from the cellphone companies, Judge Burgess stated that "the question at this stage is not whether cellphone radiation can cause adverse health effects. It is whether there is a general acceptance within the appropriately defined scientific community of plaintiffs' experts' methodology in reaching their conclusions as to causation of adverse health effects." As for whether the plaintiffs needed additional information from the defendants to help the plaintiffs' experts form opinions or to establish bias of defendants' experts, Judge Burgess determined that the plaintiffs had failed to tie a particular discovery request to those ends and noted that the plaintiffs had acknowledged that their experts had already formed their opinions. He also noted that the defendants' defenses to general causation were not relevant at this juncture.[5]

---

[5] After the court denied the *Murray* plaintiffs motion to compel ruling, the court held a status hearing for three new plaintiffs who had filed similar suits against the defendants (and later became *Brooks* plaintiffs). The court asked whether the parties wanted these new plaintiffs' cases to be "joined" with the *Murray* cases "for case management purposes" and have their names added to the case caption, i.e., whether they should be consolidated with the *Murray* plaintiffs. But counsel for the defendants stated that this was not their wish, explaining that these new cases had been filed "more than midway through th[e] nine month period for discovery in the *Murray* cases" and indicating that defendants did not want to slow the *Murray* cases down by conducting discovery in these case (as defendants would be entitled to do under the Initial Case Management Schedule for Phase I Discovery, *see supra* note 1). Instead, counsel for Motorola told the court that the plan would be to "keep these three cases stayed and the *Frye* hearing results will apply to these cases," and counsel for AT&T told the court, "we have an agreement." The conversation ended with the court directing defendants' counsel to "draft an order to that effect." Plaintiffs'

Judge Burgess memorialized his oral ruling on the *Murray* plaintiffs' motion to compel in an October 2012 written order in which he "confirmed that Phase I discovery [in the *Murray* cases] solely pertains to the issues involved in a *Frye*/*Dyas* hearing regarding Plaintiffs' general causation experts and opinions," and provided a new deadline to initiate "Phase I fact discovery, which pertains to the issues involved in a *Frye*/*Dyas* hearing regarding Plaintiffs' general causation experts and opinions."

## B. The *Brooks* Plaintiffs' Stipulations

Just seven weeks after Judge Burgess issued his written order resolving any confusion about the scope of discovery in the *Murray* cases, the *Brooks* plaintiffs[6] and the cellphone company defendants began filing Joint Stipulations and Proposed Management Orders with the court.[7] In these agreements, the parties acknowledged that (1) the *Murray* cases and the *Brooks* cases were "related, similar, and

---

counsel made no contribution to this exchange between the court and defendants' counsel.

[6] These plaintiffs, eighteen sets in all—the Brooks, Jones, Cobb, King, Butler, Phillips, Gonzalez, Anderson, Zelcer, Rice, Riepen, Ferguson, Marks, Savoury, Vervoort, Reilly, Kasperski, and DeRosa cases—were represented by the same lawyers and filed complaints nearly identical to those in the *Murray* cases. Their cases were not formally consolidated until August 2023, *see infra* Part I.F., but for ease of reference we refer to them as the *Brooks* plaintiffs throughout this opinion.

[7] All but two of the *Brooks* plaintiffs filed stipulations before the trial court held the *Frye*/*Dyas* hearing in December 2013. *See infra* notes 8 & 9.

overlapping"; (2) although no discovery had been conducted in the particular case in which the stipulation was filed, the *Murray* cases were "currently in 'Phase I' discovery" before the court; (3) the "operative Case Management Schedule governing the *Murray* cases . . . contemplate[d] a *Frye*/*Dyas* hearing on the threshold issue of general causation to be held following the conclusion of Phase I Discovery in the *Murray* cases"; and (4) "the Parties [had] agree[d] that the [trial] [c]ourt's ruling in the *Frye*/*Dyas* hearing in the *Murray* Cases will apply to . . . this case." The parties "therefore . . . agree[d] that this case should be stayed in its entirety until after the Court's resolution of the *Frye*/*Dyas* hearing in the *Murray* Cases and that the Court's ruling in the *Frye*/*Dyas* hearing in the *Murray* Cases will apply to this case." These stipulations were all signed by counsel—who for the *Brooks* plaintiffs were the same counsel that represented the *Murray* plaintiffs. *See supra* note 6. Upon receipt of these joint stipulations, the trial court filed in each of these cases an order acknowledging the stipulation and issuing a case management order which "stayed [each case] in its entirety pending the Court's resolution of the *Frye*/*Dyas* hearing" in the *Murray* cases and directed that "the court's ruling in the *Frye*/*Dyas* hearing in the *Murray* cases will apply to this case."

### C. The Decision in the *Murray* Cases to Change the Evidentiary Standard for the Admissibility of Expert Testimony

The presiding judge, now Judge Frederick H. Weisberg, held a *Frye*/*Dyas* hearing in the *Murray* cases between December 2013 and January 2014.[8] Judge Weisberg issued his *Frye*/*Dyas* ruling in August 2014. The *Murray* plaintiffs partially prevailed, with Judge Weisberg concluding that some, but not all, of plaintiffs' proffered expert testimony on general causation was admissible under the *Frye*/*Dyas* evidentiary standard, while also observing that the District of Columbia was in the small minority of jurisdictions continuing to adhere to the *Frye*/*Dyas* test and indicating that, had the *Daubert*/Rule 702 standard applied, he "almost certainly" would have deemed plaintiffs' experts' testimony inadmissible.

Over opposition from the *Murray* plaintiffs, Judge Weisberg amended his *Frye*/*Dyas* order in October 2014 to certify this interlocutory ruling for appeal. *See* D.C. Code § 11-721(d). In his certification order he noted that, because "plaintiffs' counsel [had continued to] sign up new claimants," the *Murray* cases were now only a small subset of a growing number of "individual cellphone cancer cases concurrently pending on the court's docket"; the *Murray* cases had been

---

[8] After Judge Weisberg held the *Frye*/*Dyas* hearing but before he ruled, another set of *Brooks* plaintiffs, the Kasperskis, filed a stipulation and proposed case management order that mirrored the others in all respects discussed above. Judge Weisberg's responsive order likewise tracked the prior trial court orders by directing that the court's *Frye*/*Dyas* ruling would apply.

"consolidated for the *Frye/Dyas* proceedings and the other[] [related cases] were stayed pending the outcome"; and "a Court of Appeals' opinion resolving the standard of admissibility for expert testimony could save the court and the parties years of unnecessary and prohibitively expensive litigation," particularly if the appellate court "decide[d] now to adopt a more modern approach . . . and if, as a result, Plaintiffs are left without admissible expert testimony." As part of his certification order, Judge Weisberg stayed all proceedings in the *Murray* cases, as well as in the unconsolidated related cases (including the *Brooks* cases), "pending application of appeal pursuant to D.C. Code § 11-721(d) and the disposition of that application by the District of Columbia Court of Appeals or until further order of the court."[9]

In its October 2016 en banc decision in *Motorola II*, this court overruled the *Frye/Dyas* standard, adopted the standard for the admissibility of expert testimony

---

[9] After the trial court certified its *Frye/Dyas* ruling for appeal, the *DeRosa* plaintiffs, who were the final set to consolidate with the *Brooks* cases, filed their complaint. On the parties' consent motion, the case was transferred to Judge Weisberg, who then issued an order staying the case pending the resolution of the interlocutory appeal in the *Murray* cases and directing that "the court's rulings on the admissibility of expert witness testimony on general causation in the *Murray* cases, following remand of the District of Columbia Court of Appeals, will apply to this case, as it will apply to all related cases pursuant to prior orders of this court."

set forth in *Daubert* and Rule 702, and then remanded the *Murray* cases to the trial court for further proceedings consistent with our opinion. 147 A.3d at 757-59.

### D. The Proceedings Following the *Motorola II* Remand

On remand, Judge Weisberg asked the *Murray* parties to file a status report addressing, inter alia, "[w]hether additional discovery [was] necessary on general causation issues now that the governing standard has changed" and "[t]he scope of that discovery, including whether . . . a new round of depositions of the same experts who have already testified [was needed] and whether each side propose[d] to name new experts." The *Murray* plaintiffs responded that they needed additional discovery and wanted to present new experts before relitigating the admissibility of their expert testimony. After receiving the *Murray* defendants' opposition, Judge Weisberg held a hearing in December 2016 to allow the parties to fully argue their positions.

From the outset of that hearing, it was apparent that the *Murray* cases were still operating as the plaintiffs' vanguard. When Judge Weisberg noted that he had only calendared the hearing for the *Murray* cases although thirty-eight related cases were now pending, plaintiffs' counsel confirmed that they were "comfortable that anybody that wanted to have notice of this proceeding has received it and that no counsel [who] isn't otherwise associated with it, the 13 *Murray* cases[,] has been left out." Further indicating that they were sticking to their strategy of putting the *Murray*

cases in the lead, plaintiffs' counsel also informed the court that their failure to stay six, newly-filed cases pending the resolution of the expert admissibility issue in the *Murray* cases had just been the product of "miscommunication."

As for how the *Murray* cases should proceed post-remand, plaintiffs' counsel acknowledged that, before *Motorola II*, the Case Management Plan had directed that they would first determine the admissibility of their general causation experts at a *Frye* hearing. But plaintiffs' counsel argued as they had in their status report that they now needed "full discovery" in the *Murray* cases. Unconvinced, Judge Weisberg reminded plaintiffs' counsel that their cases were still "at an earlier stage where the question is whether you have experts who can testify about general causation"—"whether they have used reliable methods, reliably applied to the facts of the case, not whether . . . you are going to be able to survive a motion for judgment as a matter of law on general causation"—and he expressed skepticism either that the scope of discovery needed to change because of the change in the admissibility standard or that Judge Burgess would have ruled differently regarding the scope of discovery had *Daubert*/Rule 702 been the standard from the outset.

Plaintiffs' counsel also argued that they should be permitted to present new experts because "a lot of new science [had] come out." In the course of this conversation, the existence of other non*Murray* plaintiffs came up again when Judge Weisberg asked plaintiffs' counsel, "[W]hat prevents you from starting those

[non*Murray*] cases rather than joining them with the *Murray* cases . . . and doing what you say you want to do now?" But far from seizing upon this suggestion or replying that nothing was standing in the non*Murray* plaintiffs' way from resuming litigation, plaintiffs' counsel continued to push to keep all the pending cases together "for efficiency" and used the argument that the non*Murray* plaintiffs should not be "penalized" by being "handcuffed" to the *Murray* cases as a justification for revising the terms of the Initial Case Management order in the *Murray* cases.

At the close of the hearing, Judge Weisberg announced his tentative ruling denying the plaintiffs' requests for more discovery and new experts but allowing the plaintiffs to submit a more tailored request to present new studies and to supplement the reports of previously identified experts. Judge Weisberg stated, without protest from plaintiffs' counsel, that the court would continue to stay the non*Murray* cases and figure out "at a later time" how its order denying the *Murray* plaintiffs' motion for additional discovery applied to the non-*Murray* plaintiffs.  After the hearing, plaintiffs' counsel filed a Motion for Additional Discovery in the *Murray* cases but made no argument in that motion about the non*Murray* cases.

In a March 2017 written order, Judge Weisberg ruled that "[t]he change from *Dyas/Frye* to Rule 702 d[id] not change the court's plan for the management of [the *Murray* cases]." He explained that the original "case management orders were driven by the reality that no American court had ever accepted the theory that non-ionizing

radiation from cellphones could cause [the types of adverse health effects alleged by plaintiffs], and it was unfair to force Defendants to defend such complex and expensive litigation unless Plaintiffs could present admissible expert testimony on general causation." Judge Weisberg further explained that, to resolve now whether "these cases can finally move out of the starting blocks," there was no need to broaden the scope of discovery or allow the plaintiffs to present new experts.

As for discovery, Judge Weisberg noted that "[t]he point of Phase I discovery was to test whether Plaintiffs had the science to back up their experts' opinions on general causation" and both "before and after the change in the admissibility standard," experts had to "base their opinions . . . on reliable scientific principles and methods" and rely on "validated and replicated experiments, case studies, and peer reviewed publications." Rejecting the argument that it was unfair to deprive "the Plaintiffs [of] an opportunity to conduct any discovery beyond the limited Phase I discovery on the question of admissibility of their expert witness testimony," Judge Weisberg stated that discovery had been limited in this manner "from the beginning" by "the prior case management orders that have governed the litigation of these cases."

As for new experts, Judge Weisberg also saw no need, explaining that under the Initial Case Management Order the plaintiffs had been required after the close of discovery "to produce *all* of their experts on general causation, with a report from

each expert setting forth 'a complete statement of all opinions the witness will express on general causation and the basis and reasons for them.'" Judge Weisberg highlighted the fact that, in imposing this obligation, the order had used the "same language that would have been used in a comparable order from a federal district court operating under [*Daubert/*]Rule 702," citing to Federal Rule of Civil Procedure 26(a)(2)(B)(i). Judge Weisberg did, however, allow plaintiffs' experts to supplement their reports with new studies and revise the manner in which they expressed their opinions to account for the new admissibility standard.

Lastly, Judge Weisberg acknowledged in a footnote that there might be a question about the fate of the non*Murray* cases—which "ha[d] been stayed by agreement of the parties, including [an] agreement to be bound by the court's ultimate ruling in the '*Murray* cases.'" Judge Weisberg noted that the issue had been raised at the December 2016 hearing and further stated, inaccurately, that *plaintiffs* had argued that "it [wa]s unfair to hold them to their agreement now that the outcome will be determined by a new standard, which was not in effect at the time they adopted their strategy" (in fact the court had raised this concern on the non*Murray* plaintiffs' behalf). But Judge Weisberg said nothing more on the subject, observing that "[t]he parties have not briefed that issue."

After Judge Weisberg issued his March 2017 post-remand ruling adhering to the plan to address first the issue of the admissibility of the plaintiffs' experts'

testimony regarding general causation and to limit discovery to that end, the new presiding judge, Judge Anita Josey-Herring, asked the parties in a number of non*Murray* and non*Brooks* cases if they intended to be bound by the result of Phase I of the *Murray* litigation even though they had not so stipulated. Counsel for the *Murray* and *Brooks* plaintiffs, who also represented this collection of plaintiffs, responded that they would "be bound by the general causation outcome in the *Murray* cases," and defendants responded likewise. Thereafter Judge Josey-Herring issued a number of sua sponte orders in these cases in which she noted that the trial court's "ruling on the admissibility of expert witness testimony on general causation in the *Murray* Cases, will apply to this case, as it will apply to all related cases pursuant to prior orders of this court." Several months later, the defendants filed motions for stays in subsequently filed non*Murray* and non*Brooks* cases "with the consent of Plaintiffs" in non*Murray*, non*Brooks* cases and in which the defendants stated that "[t]he parties ha[d] agreed to be bound by the general causation ruling in the consolidated *Murray* cases." As in her sua sponte orders, Judge Josey-Herring granted these consent motions and stated that her "ruling on the admissibility of expert witness testimony on general causation in the *Murray* cases will apply to this case, as it will apply to all related cases pursuant to prior orders of this court." Her successor, Judge Jennifer M. Anderson, similarly continued through 2020 to grant

consent motions to stay later-filed non*Murray* and non*Brooks* cases "until [the] determination [of] the general causation issue in the *Murray* cases."

In the meantime, between 2017 and 2021, the *Murray* parties engaged in more litigation in front of Judge Josey-Herring and the successor presiding judge in the *Murray* (and *Brooks*) cases, Judge Alfred S. Irving, related to the *Murray* plaintiffs' efforts to supplement their expert reports, present new experts, and obtain broader discovery. Because we reviewed and affirmed the rulings by Judge Josey-Herring and Judge Irving in *Motorola III*, we do not detail that litigation here.

### E. The Non*Murray* Plaintiffs' 2021 Motion to Lift the Stay

In July 2021, now five years after this court's remand in *Motorola II*, all of the non*Murray* plaintiffs—including the *Brooks* plaintiffs—filed a motion to lift the stays in their cases. These plaintiffs conceded that "some" of them had "agreed . . . that the general causation expert witness admissibility rulings in the *Murray* Cases will apply for the sake of efficiency and non-duplication," although they did not specifically acknowledge the stipulations that all but one of the *Brooks* plaintiffs had filed, much less parse the language of these stipulations. Nevertheless, they sought to argue that the scope of these agreements was narrow. Alternatively, they asserted that "the science, research[,] and studies [had] continued to significantly evolve" and "the expert admissibility standard [had] unexpectedly

changed." For these reasons, the non*Murray* plaintiffs argued that they would "be prejudiced if their cases continued to be held in abeyance" and that the stays should thus be lifted. Judge Irving denied the motion.

### F. The Summary Judgment Ruling in the *Brooks* Cases after the *Daubert*/Rule 702 Ruling in the *Murray* Cases

Judge Irving held a *Daubert*/Rule 702 hearing in September 2022 "to determine whether to admit the testimony and opinions of [the *Murray*] Plaintiffs' expert witnesses regarding general causation, *i.e.*, whether non-ionizing radiation from cellphones has a non-thermal effect that causes, promotes, or accelerates the growth of brain tumors, specifically gliomas and acoustic neuromas." He concluded in April 2023 that none of the expert testimony proffered by the *Murray* plaintiffs was admissible, and he ultimately granted summary judgment to the defendants in those cases because the plaintiffs lacked the requisite expert testimony to support their claims.

Days later, for the purpose of summary judgment briefing, Judge Irving consolidated the eighteen *Brooks* cases, *see supra* note 6, pursuant to Superior Court Rule of Civil Procedure 42, based on their similar procedural posture and their "written consent to be bound by the Court's exclusion of expert testimony in the *Murray* cases." The defendants then moved for summary judgment in these cases based on the lack of admissible expert testimony. In their written opposition, the

*Brooks* plaintiffs argued that (1) they "never agreed to be bound by the *Daubert*/Rule 702 proceedings [in the *Murray* cases] (only by *Frye*/*Dyas*)"; (2) they had not agreed to the particular rulings in the *Murray* cases limiting the experts who could be named, the expert reports that could be submitted, or the discovery that could be obtained; and (3) it would be unreasonable to hold them to any such agreement "given the large passage of time since the *Murray* plaintiffs named their general causation witnesses and the significant scientific progress occurring during such passage of time." But at the hearing on the motion, plaintiffs' counsel retreated from the first two arguments, acknowledging that they were "not going to suggest to the court today that there was not an agreement in place in these cases" and asserting that the "focus should not be on the agreements of the part[ies]." Instead, they made the unfairness of holding them to their agreements the centerpiece, stressing that the trajectory of the *Murray* litigation and the change in the admissibility standard had been unforeseen and noting "the law recognizes that a change in circumstances . . . can at times cause an agreement to be altered, something that was binding to not be binding."

In his order granting summary judgment, Judge Irving determined that the *Brooks* plaintiffs had agreed to be bound by both the substantive result and the case management arrangements in the *Murray* cases, and thus they lacked the requisite expert testimony to support their claims. This timely appeal followed.

## II.    Analysis

### A. Whether the *Brooks* Plaintiffs Agreed to be Bound by the Outcome of the Expert Admissibility Litigation in the *Murray* Cases[10]

In our legal system, there is "deep-rooted historic tradition that everyone should have his own day in court." *Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008). Accordingly, an individual generally "is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Id.* at 893. But there are exceptions to this general rule, such as when a party agrees in advance—either expressly or implicitly—to be bound by a legal ruling in another case where they are not a party (or in privity with the party). *Id.* "For example, if separate actions involving the same transaction are brought by different plaintiffs against the same defendant, all the parties to all the actions may agree that the question of the defendant's liability will be definitely determined, one way or the other, in a test case." *Id*. (quoting D. Shapiro, Civil Procedure: Preclusion in Civil Actions 77-78 (2001) (citation modified)); *see also* Restatement (Second) of Judgments § 40 (1982) (recognizing that "[a] person

---

[10] The *Brooks* plaintiffs' lead argument to this court is that they should not have been bound by the outcome of the expert admissibility litigation in the *Murray* cases because "the requirements for collateral estoppel were not met." We do not address this argument because the trial court did not employ a collateral estoppel analysis, *see supra* Part I.F., though we tend to agree that a collateral estoppel analysis would ill-fit the *Brooks* plaintiffs' forward-looking agreements to be bound by litigation that was not yet final at the time of their agreements.

having a claim or defense paralleling or related to other litigation may agree that the outcome of the other litigation will be determinative of the issues in his case" and that "[a]n agreement to be bound by the result of another action may be express . . . [or] implied from conduct and manifestations of intention"); *cf.* § 4453 Preclusion by Consent and Estoppel by Conduct, 18A Fed. Prac. & Proc. Juris. § 4453 (3d ed.) (acknowledging that "[t]he repose and reliance interests generated by a judgment may deserve protection against nonparties for reasons of acquiescence that depart from any of the common 'privity' theories of participation, representation, or property" and that such acquiescence can take the form of "actual consent" or "estoppel by conduct"). "Whether there is such an agreement, and its scope, is a matter of inference from all the circumstances," Restatement (Second) of Judgments § 40, which presents a legal question that we review de novo. *See Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1545 (Fed. Cir. 1994) (explaining that "[t]he proper interpretation of the parties' pretrial stipulation [to be bound by a judgment in another case] . . . presents a legal question that we address *de novo*"); *cf. Bell v. Weinstock, Friedman & Friedman, P.A.*, 341 A.3d 1, 9 (D.C. 2025) ("We . . . review de novo whether a claim is barred by res judicata.").

To determine whether the *Brooks* plaintiffs agreed to be bound by the expert admissibility rulings in the *Murray* cases, we look first to the joint stipulations the

*Brooks* parties filed.[11] The *Brooks* plaintiffs acknowledge these stipulations but dispute their scope, arguing that (1) they "expressly agreed to be bound only by the results of the *Frye*/*Dyas* hearing . . . in the *Murray* cases," and (2) they did not reflect the *Brooks* plaintiffs' agreement "to forgo general causation discovery of their own, much less to be bound by the *Murray* plaintiffs' case management schedule." When reviewing a written agreement, this court interprets it "as a whole, giving a reasonable, lawful, and effective meaning to all its terms, and ascertaining the meaning in light of all the circumstances surrounding the parties at the time the contract was made." *Nest & Totah Venture, LLC v. Deutsch*, 31 A.3d 1211, 1219 (D.C. 2011) (internal quotations omitted). We ask whether a reasonable person would have understood what the contract meant, "presum[ing]" that person "know[s] all the circumstances surrounding the contract's making" and deeming that person "bound by usages of the terms which [it] knows or has reason to know." *Id*. Applying this standard, we are unpersuaded by the *Brooks* plaintiffs' arguments, which, even when they are grounded in the actual text of the stipulations, seek to interpret them wholly out of context of what the signers—counsel for both parties— knew about "all the circumstances surrounding" their agreements.

---

[11] As noted above, all but one set of the *Brooks* plaintiffs, the *DeRosa* plaintiffs, filed a written stipulation. We address the *DeRosa* plaintiffs below.

The *Brooks* plaintiffs first argue that they expressly agreed to be bound only by the "results of the '*Frye/Dyas* hearing' or the '*Frye/Dyas* issues' in the *Murray* cases." Although it is true that the *Brooks* parties agreed in their joint stipulations that "the Court's ruling in the *Frye/Dyas* hearing in the *Murray* cases will apply to this case," *see supra* Part I, we conclude that the reference to "a *Frye/Dyas* hearing" cannot be literally understood as a reference to a hearing under a particular evidentiary standard; rather, when examined in the context of the procedural history of the *Murray* and *Brooks* cases, it is only reasonably understood as a synonym for "an expert admissibility hearing."

By the time the *Brooks* parties filed their joint stipulations, the trial court, mindful of the growing number of plaintiffs' cases regarding the alleged harmful effects of cellphone radiation and wary of getting bogged down in an array of pretrial proceedings, had structured the *Murray* cases so that the litigation of the expert admissibility issue as to "general causation" would be the gateway issue. As Judge Burgess discussed with the parties at the November 2011 and September 2012 hearings and incorporated into the case management order, if the *Murray* plaintiffs could present admissible expert testimony that cellphone radiation could cause the types of adverse health effects alleged, their cases could move forward; if not, their cases would be dismissed. All the court's references to *Frye/Dyas* simply reflect that this was the governing expert admissibility standard at the time—not that the specific

*Frye*/*Dyas* standard was foundational to the court's decision making regarding its bifurcation ruling. Put another way, the focus in the *Murray* cases was on establishing whether plaintiffs had admissible expert testimony about "general causation," and there is no indication in the record that the litigation of the *Murray* cases would have been structured any differently had the standard for expert admissibility been *Daubert*/Rule 702 from the outset. To the contrary, as Judge Weisberg acknowledged, the order that directed the disclosure of expert reports following discovery presciently used "the same language for expert reports that would have been used in a comparable order from a federal district court," where the *Daubert*/Rule 702 test is employed.[12] *See supra* note 2.

In light of this procedural history—fully known to counsel who signed the *Brooks* plaintiffs' joint stipulations because the very same counsel represented the *Murray* plaintiffs, *see supra* note 6—the stipulations reflect an informed, strategic choice: the *Brooks* plaintiffs chose to let the *Murray* plaintiffs go first to see if they could get a favorable ruling on expert admissibility regarding general causation. And when the *Brooks* plaintiffs agreed to be bound by the court's ruling after a

---

[12] Judge Weisberg highlighted this point when he rejected the *Murray* plaintiffs' argument on remand post-*Motorola II* that the change in the expert admissibility standard necessitated a rethinking of the scope of Phase I discovery or the case management order more generally. This court concluded in *Motorola III* that Judge Weisberg had "correctly" understood Judge Burgess's Case Management Order. 339 A.3d at 156.

"*Frye*/*Dyas*" hearing, they accepted the general framework for litigating expert admissibility first—not just the specific label attached to the hearing for that purpose.[13]

We do not deny that there are cases like *Keller Tank Servs. II v. Comm'r of Internal Revenue*, 854 F.3d 1178, 1194 (10th Cir. 2017), in which a court has held (in the *Brooks* plaintiffs' words) that "an agreement to be bound by the results of one hearing cannot be extended to other related proceedings or matters." We simply disagree that the *Brooks* plaintiffs' stipulations can be reduced to agreements to be bound by the results of a *Frye*/*Dyas* hearing when their language is read in historical context.

---

[13] We focus on what the *Brooks* plaintiffs knew before counsel signed and filed stipulations on their behalf. But the *Brooks* plaintiffs' argument that they thought they had agreed to be bound only by the outcome of a *Frye*/*Dyas* hearing in the *Murray* cases is also undercut by their behavior after this court decided *Motorola II* and adopted the *Daubert*/Rule 702 expert admissibility standard. *See Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 299 (D.C. 2006) (explaining that when interpreting contracts, "[t]he reasonable person standard is applied both to the circumstances surrounding the contract and the course of conduct of the parties under the contract"). For years after the issuance of the *Motorola II* decision, none of the *Brooks* plaintiffs who had filed stipulations binding themselves to the expert admissibility litigation in the *Murray* cases gave any indication that they no longer understood themselves to be bound by these stipulations or sought to take any action independent of the *Murray* plaintiffs. Nor did they protest when the trial court stated, in later orders staying new cases brought by their counsel, that its "ruling on the admissibility of expert witness testimony on general causation in the *Murray* Cases, will apply to this case, as it will apply to all related cases pursuant to prior orders of this court."

We also disagree that any of the trial judges in this case actually interpreted the language of these stipulations to align with the *Brooks* plaintiffs' appellate argument. Thus, we reject the *Brooks* plaintiffs' argument that Judge Weisberg "recognized[] these agreements were 'based in part on the understanding that the *Dyas/Frye* test would determine the outcome.'" The *Brooks* plaintiffs quote incompletely from a footnote in Judge Weisberg's March 2017 order denying the *Murray* plaintiffs' request for additional discovery based on the change in the admissibility standard in *Motorola II*. In that footnote, Judge Weisberg observed that an issue had been raised about the continued force of the non*Murray* parties' "agreement[s] to be bound by the court's ultimate ruling in the '*Murray* cases,' based in part on the understanding that the *Dyas/Frye* test would determine the outcome." But he did not examine the language of the stipulations; to the contrary, because "the parties ha[d] not briefed that issue," Judge Weisberg declined to address the meaning or continued force of these agreements. Thereafter no one raised the issue of whether the non*Murray* plaintiffs were still bound by the *Murray* litigation until 2021 when the non*Murray* plaintiffs collectively moved to lift the stays in their cases, but the language of the *Brooks* plaintiffs' stipulations was not examined at that time either. *See supra* Part I.E. Thus no trial court resolved whether the *Brooks* plaintiffs' agreements bound them to the outcome of the court's ruling in the *Murray* cases regarding expert admissibility on general causation until Judge Irving addressed that

question in his order granting the defendants summary judgment—the order currently on appeal.

The *Brooks* plaintiffs also argue that they never agreed "to forgo general causation discovery of their own, much less to be bound by the *Murray* plaintiffs' case management schedule." We return to the language of the stipulations, which the *Brooks* plaintiffs largely ignore. The *Brooks* plaintiffs expressly acknowledged in those agreements that the *Murray* cases were "currently in 'Phase I discovery,'" which—as the *Murray* parties extensively discussed at the November 2011 and September 2012 hearings prior to the *Brooks* parties' stipulations—was "limited" to determining whether the *Murray* plaintiffs had admissible expert testimony about general causation (i.e., whether their experts could testify that cellphone radiation could cause the adverse health effects alleged). The *Brooks* plaintiffs further acknowledged that the "operative Case Management Schedule governing the *Murray* cases . . . contemplate[d] a *Frye/Dyas* hearing on the threshold issue of general causation to be held following the conclusion of Phase I Discovery in the *Murray* cases." And as noted above, the *Brooks* plaintiffs then agreed that the trial court's expert admissibility ruling "in the *Murray* cases will apply to . . . this case."

Read together, the only reasonable understanding of these provisions in the joint stipulations is that the *Brooks* plaintiffs agreed to be bound not only by the trial court's expert admissibility ruling, but also by the bifurcated case management

framework that generated it. The *Brooks* plaintiffs' contrary argument—that they always reserved the right to engage in "general causation discovery of their own" and to be governed by their own case management schedule—has no record foundation. There is nothing in the stipulations or elsewhere in the contemporaneous record indicating that the *Brooks* plaintiffs sought to maintain some measure of independence vis-à-vis general causation discovery or management of their nascent cases prior to a resolution of the expert admissibility question in the *Murray* cases. The absence of any reservation of rights is particularly conspicuous given the *Murray* plaintiffs' failed attempt at the September 2012 hearing to persuade the court to give them broader discovery only weeks before the *Brooks* plaintiffs began filing their joint stipulations. Moreover, any argument that the *Brooks* plaintiffs retained some independent right to additional discovery or case management makes no sense in light of their agreement to stay their cases and to be bound by the trial court's expert admissibility ruling regarding general causation in the *Murray* cases. Unless the trial court ruled that the plaintiffs had admissible expert testimony allowing their case to move forward, the *Brooks* plaintiffs had no need for additional discovery; and if the court ruled in the *Murray* (and *Brooks*) plaintiffs' favor, they were assured of it.

One subset of *Brooks* plaintiffs, the *DeRosa* plaintiffs, did not file a stipulation agreeing to be bound by the trial court's expert admissibility ruling regarding general

causation and its predicate discovery and case management rulings. In their brief to this court, the *Brooks* plaintiffs made no argument that this court should treat the *DeRosa* plaintiffs differently;[14] nevertheless, we briefly explain why we deem the *DeRosa* plaintiffs to have implicitly agreed to the same material terms as the *Brooks* plaintiffs. The *DeRosa* plaintiffs filed their case after Judge Weisberg certified his *Frye*/*Dyas* ruling in the *Murray* cases for interlocutory appeal. They then expressly consented to have their pending scheduling conference canceled and their case transferred to Judge Weisberg because "the *Murray* cases and other related cases currently pending before Judge Burgess involve some common issues of fact and law." When the court sua sponte issued an order staying the *DeRosa* case pending decision by this court in the *Murray* cases' interlocutory appeal and directing that "the court's rulings on the admissibility of expert witness testimony on general causation in the *Murray* cases, following remand . . . will apply to this case, as it will apply to all related cases pursuant to prior orders of this court," the *DeRosa* plaintiffs made no protest, nor did they subsequently attempt to take any action to indicate that they, unlike the other *Brooks* plaintiffs, had not agreed to be bound by the trial court's

---

[14] Instead, the *Brooks* plaintiffs argued that the trial court should not have interpreted their stipulations to align with the language of the court's order in *DeRosa*, *see supra* note 9 & *infra*. But we interpret the language of the *Brooks* plaintiffs' joint stipulations de novo without reference to the subsequent *DeRosa* order. *See supra* Part II.A.

expert admissibility ruling regarding general causation or its predicate procedural decisions. Citing the Second Restatement of Judgments, Section 40, comment b, illustration 3, the *Brooks* plaintiffs argue that implied agreements binding one party to the litigation of another should not be inferred except under the plainest circumstances. We conclude such plain circumstances are present in this case.

In short, all of the *Brooks* plaintiffs agreed, expressly or implicitly, that they would be bound both by the trial court's expert admissibility ruling regarding general causation and its predicate discovery and case management rulings in the *Murray* cases. Indeed, they arguably abandoned their arguments to the contrary at the 2023 summary judgment hearing, when they told Judge Irving that they were "not going to suggest . . . that there was not an agreement in place in these cases," and urged the court instead to deem these agreements, whatever their terms, unenforceable. The *Brooks* plaintiffs make similar enforceability arguments on appeal, and we turn to those arguments now.

**B. Whether the *Brooks* Plaintiffs Should be Held to Their Agreements**

The *Brooks* plaintiffs argue that, even if they did agree to be bound by the court's expert admissibility ruling regarding general causation in the *Murray* cases and the procedural decisions that preceded it, they withdrew their consent when they moved to lift the stays in their cases in 2021. They also argue that it would be unfair

under the circumstances to bind them to the rulings in the *Murray* cases, both because the court's rulings in the *Murray* cases were procedurally and substantively wrong, and because of the change in the science with the passage of time. We address each of these arguments in turn.

The *Brooks* plaintiffs assert that "[a]fter it became clear that the *Murray* plaintiffs would be prohibited from adding new experts, the *Brooks* plaintiffs, along with plaintiffs in other nonconsolidated cases, promptly moved to lift the stay orders" in their cases and that, in "rul[ing]" on this motion, Judge Irving "recognized that the 'weight that a determination in the *Murray* cases may hold in the subsequently filed cases is not necessarily clear.'" First, we note that Judge Weisberg had ruled that the *Murray* plaintiffs could not name new experts in March 2017, shortly after the remand in *Motorola II*; thus the non*Murray* plaintiffs' motion to lift the stays in their cases in 2021 was hardly a "prompt" response to this development.[15] *See supra* note 13 (highlighting the *Brooks* plaintiffs' inaction during

---

[15] Moreover, even before Judge Weisberg ruled, counsel for the *Murray*, *Brooks*, and other nonconsolidated plaintiffs knew he was skeptical of the *Murray* plaintiffs' need to name new experts or obtain "full discovery" post-remand. Judge Weisberg made these views clear at the December 2016 hearing. Counsel for the *Murray*, *Brooks*, and other nonconsolidated plaintiffs not only attended that proceeding, they repeatedly indicated that they were appearing on behalf of the *Murray* and non*Murray* plaintiffs alike: they told the court that they were "comfortable" that the court had only noticed the hearing in the *Murray* cases and informed the court that they had meant to agree to a stay in six newly-filed non*Murray* cases, and when the court asked whether the nonconsolidated cases

this time period). Second, the *Brooks* plaintiffs incompletely quote Judge Irving's 2021 order denying their motion to lift the stays.[16] Judge Irving never "ruled" (as the *Brooks* plaintiffs assert) that whether they should be bound by their stipulations was debatable, much less doubtful, because the nonconsolidated plaintiffs never referenced their stipulations in their motion to lift the stays. Rather, Judge Irving simply acknowledged the nonconsolidated plaintiffs' argument that "the language of *the several stay orders* has not been uniform, and the weight that a determination in the *Murray* cases may hold in the subsequently filed cases is not necessarily clear, *at this juncture*." (emphasis added) In other words, Judge Irving did not examine the language of the *Brooks* plaintiffs' stipulations, as this court has done, and he merely indicated generally that the effect of the *Murray* cases on the nonconsolidated cases (which encompassed many more cases than the *Brooks* cases) had yet to be finally resolved (as it was when Judge Irving granted the *Brooks* defendants' summary judgment motion, the order now on appeal).

But even if the *Brooks* plaintiffs' adoption of the motion to lift the stays in all the non*Murray* cases in 2021 should also be understood as an attempt to revoke their

---

should split off from the *Murray* cases, they argued instead that these cases should continue to be litigated together "for efficiency['s]" sake.

[16] This argument is in some tension with the *Brooks* plaintiffs' argument to this court, rejected above, that Judge Weisberg had already "recognized" their agreements related only to a *Frye/Dyas* hearing. Notably, the *Brooks* plaintiffs did not argue to Judge Irving that Judge Weisberg had already resolved this question.

agreements to be bound by the *Murray* litigation regarding expert admissibility on general causation, we see no reason why that attempted revocation should be given any force now. The *Brooks* parties made these agreements before the *Murray* parties finally litigated the admissibility of expert testimony for the sole purpose of streamlining the *Brooks* cases. Either the *Brooks* plaintiffs would get the benefit of a breakthrough ruling if the *Murray* plaintiffs prevailed, or the defendants would have the basis to seek a clean exit in eighteen additional cases. And when the parties made these agreements, they both assumed the risk that the litigation in the *Murray* cases might take some twists and turns. The *Brooks* plaintiffs cite no authority, and we are aware of none, that supports their argument that they should not be held to these agreements just because, years after they entered into them, they indicated that they no longer desired to be bound by them.

The *Brooks* plaintiffs separately argue that it would be unfair to hold them to their agreements. As their first line of attack, they argue that the *Murray* plaintiffs were denied a full and fair opportunity to litigate the issue of the admissibility of their experts at their *Daubert*/Rule 702 hearing and that the trial court's determination that none of their proffered testimony was admissible was wrong. But after the *Brooks* plaintiffs filed their initial brief to this court, this court rejected in *Motorola III* the *Murray* plaintiffs' similar, if not identical, challenges to the procedural and substantive rulings in their cases. 339 A.3d at 169-74. The *Brooks*

plaintiffs fail to explain why their argument is not foreclosed by our decision in *Motorola III*, except to assert, without citation to any authority, that they, unlike the *Murray* plaintiffs, are entitled to de novo review of the court's trial rulings in the *Murray* cases. But the full and fair opportunity the *Murray* plaintiffs (and the *Brooks* plaintiffs, by agreement) had to litigate the admissibility of their expert testimony regarding general causation encompassed this court's abuse of discretion review of the trial court's ruling. And the fact that this court reviews de novo whether the *Brooks* plaintiffs are bound by the expert admissibility ruling in the *Murray* cases does not mean that we will reexamine the correctness of these rulings in this appeal.

The *Brooks* plaintiffs also argue that it would be unfair to hold them to their agreements because of the new science supporting their claims. But the *Murray* plaintiffs made this same argument to us on appeal in *Motorola III*, and we rebuffed it. We explained, "in a world of ever-evolving scientific developments, discovery cannot be allowed to proceed indefinitely. There must be a limiting principle," otherwise

> [e]very year . . . as research universities graduate the next class of doctoral students, plaintiffs would be able to add new expert witnesses in a bid to strengthen their case. As new peer-reviewed studies are published, existing experts would seek to continuously revise their opinions or add new opinions. Such a system would trigger ever more discovery such that cases could effectively never proceed to trial . . . [and] civil defendants would be deprived of the

opportunity to resolve claims against them, including by prevailing pretrial such as on summary judgment.

339 A.3d at 169. We reiterate our pronouncement in *Motorola III* that "[w]e cannot, and do not, countenance such a system." *Id.*

## C. Response to the Dissenting Opinion

The dissent looks everywhere but to the express agreements that are central to the resolution of this case: the joint stipulations, signed by *both* the *Brooks* plaintiffs *and* the cellphone defendants, in which they committed to be bound by the outcome of the expert admissibility litigation in the *Murray* cases and by the case management orders leading up to it. Instead, taking events out of order and misreading selections of the 8,000-plus-page record, the dissent constructs an alternate narrative in which the *Brooks* plaintiffs agreed with the court (albeit only implicitly) to be bound by the determination that the *Murray* experts could not testify based on their particular expert reports but retained the right to unfettered discovery and to relitigate expert admissibility with new experts or even the same experts with new expert reports. This did not happen, nor do the *Brooks* plaintiffs argue that it did. But a few points warrant elaboration.

Although the dissent never examines the *Brooks* parties' joint stipulations on their own terms, the dissent effectively concedes, *see post* at 51-55, the import of their reference to the fact that the *Murray* cases were in "Phase I discovery" that

would lead to an expert admissibility hearing, the ruling of which the *Brooks* parties "agreed . . . will apply" to their cases.[17] *Supra* at I.B. The dissent, however, attempts to show that there was confusion even in the *Murray* cases about what Phase I discovery entailed, and contends that plaintiffs' counsel's passing remark at the September 2012 hearing that he would not have "stipulated" to the *Murray* case management order in the *Murray* cases had he understood it to confine discovery so narrowly shows that the plaintiffs did not later agree to such restrictions in the *Brooks* cases. *Post* a 53-55. The dissent misunderstands the record. First, at the November 2011 hearing and in the December 2011 order, Judge Burgess unambiguously limited the scope of discovery in Phase I of the *Murray* cases to that which was necessary to rule on expert admissibility. *See supra* I.A. Second, plaintiffs' counsel did not "stipulate" to the December 2011 order; as Judge Burgess noted when counsel used that word at the September 2012 hearing, the order came from the court and the court alone. *See supra* note 3. Third, although plaintiffs' counsel tried to argue that there had been a "disconnect" about "general causation" terminology used at the November 2011 hearing which was then incorporated in the December 2011 order,

---

[17] The dissent states that the joint stipulations' language "was incorporated verbatim in the November 29, 2012, 'Order Granting Stipulat[i]on' . . . that is the focus of [the dissent's] analysis." *Post* at 51 note 2. But as the language from the joint stipulations quoted in Part I.B. above demonstrates, the language of the joint stipulations went beyond the court's *orders* (the dissent suggests there was only one such order; in fact, there were eighteen, one for each of the component *Brooks* cases, *see supra* Part I.B. & notes 8 & 9).

Judge Burgess never conceded such disconnect[18]; if anything, he perceived the *Murray* plaintiff's claims of confusion to be part of an attempt to move the goal posts and to extend discovery to the boundaries they had initially suggested in their original bifurcation proposal.[19] Fourth, any actual misunderstanding the *Murray* plaintiffs had about the scope of Phase I discovery leading up to the expert admissibility ruling was squarely addressed at the September 2012 hearing, which

---

[18] The dissent states that "Judge Burgess agreed with [plaintiffs' counsel] that there had been a 'disconnect in terms of the terminology.'" *Post* at 54. In fact, when the plaintiffs' counsel argued that there had been a "disconnect" about what general causation meant at the November 2011 hearing, Judge Burgess rejected this argument, responding that he had "said very clearly" at that proceeding that the parties would have "staged discovery" with the "first stage [of] discovery aimed toward a *Frye* hearing." Later, when plaintiffs' counsel stated they were having a "disconnect *here,*" i.e., at the September 2012 hearing about the proper scope of discovery, Judge Burgess agreed with that statement, but reiterated that he was "very firm in [his] opinion that [in his December 2011 order he] was directing this hearing toward, this discovery toward *Frye* hearing, nothing more." Subsequently, in his ruling that the plaintiffs' motion to compel was founded on a "mistaken premise," Judge Burgess allowed that he "may have at one point in the hearing confused things by saying at page 73 that the *Frye* hearing and discovery leading up to it would be, 'directed toward whether there's a consensus among the scientific community that cellphone radiation can cause one of these four tumors or other health effects'"; but he then stated that he had been "clear that we would be trying to 'figure out whether you, i.e., the plaintiffs can make the *Frye* standard.'" In other words, Judge Burgess consistently rejected the argument that he had been unclear either at the November 2011 hearing or in his December 2011 order. *See supra* note 3.

[19] This was the cellphone company defendants' assessment of the *Murray* plaintiffs' arguments, and they accused the *Murray* plaintiffs of "trying to blow . . . up" the case management plan leading up to the expert admissibility hearing, which was supposed to be "an efficient, quick, and rifle shot procedure."

preceded the signing of the *Brooks* parties' joint stipulations. [20] *See supra* I.A & B. In short, at the point when plaintiffs' counsel began signing these joint stipulations on behalf of the *Brooks* plaintiffs, they could not have reasonably thought that either the *Murray* plaintiffs (or the *Brooks* plaintiffs, derivatively) were entitled to discovery beyond that which was necessary to litigate whether their experts had admissible testimony about general causation.

The dissent also finds in the record an affirmative agreement between the court and the *Brooks* parties that the *Brooks* parties would *not* be bound by the case

---

[20] As the dissent highlights, *post* at 57-58 note 8, both the cellphone defendants and Judge Burgess indicated at that September 2012 hearing that the *Murray* plaintiffs could get broad discovery they sought if they "survived *Frye*"—i.e., if the *Murray* plaintiffs proved they had admissible expert testimony. The dissent then floats the possibility that, because the *Murray* plaintiffs literally did survive *Frye* when Judge Weisberg ruled under that now-retired standard that some of their experts could testify, the *Brooks* plaintiffs could reasonably have thought they were entitled to full discovery from that point forward. *Id*. But this line of reasoning disregards what we have already explained: the parties used "*Frye*" only as a shorthand reference for whatever standard would ultimately govern expert admissibility. *See supra* Part II.A. And the *Brooks* plaintiffs' subsequent failure to make the argument the dissent raises for them buttresses our analysis. In the wake of Judge Weisberg's nonfinal August 2014 expert admissibility ruling the *Brooks* parties tellingly never sought full discovery or otherwise treated Judge Weisberg's ruling as having triggered such an entitlement. When Judge Weisberg issued a stay in the *Murray* and *Brooks* cases in October 2014 pending this court's review of his ruling on appeal, *see supra* Part I.C., the *Brooks* plaintiffs did not seek to challenge that stay on the grounds that they were entitled to proceed to full discovery because the *Murray* plaintiffs had "survived *Frye*" in Superior Court. And when the *Brooks* plaintiffs eventually moved, in 2021, to lift the stays in their cases, they did not argue that they had been promised full discovery if the *Murray* plaintiffs "survived *Frye*," no matter the fate of that ruling on appeal. *See supra* Part I.E.

management and scheduling orders in the *Murray* cases. *Post* at 52. Looking to September 2012, the dissent focuses on the status hearing the court held regarding the three new not-yet-*Brooks* plaintiffs after the court denied the *Murray* plaintiffs' motion to compel. The dissent then asserts that "the resolution of th[is] status hearing was that the court and the parties understood that the *Brooks* plaintiffs were *not* joining the *Murray* cases for management or scheduling purposes." *Id.* at 51. The *Brooks* parties themselves do not argue that they had such an agreement, although one would think they would be the first to tell us about it. Again, the dissent misunderstands the record. The issue the court raised at the status hearing for the three new plaintiffs was whether their cases should be consolidated with the *Murray* cases. *See supra* note 5. The new plaintiffs never spoke to this issue; rather the only parties who did so were the cellphone company defendants. *Id*. And the cellphone company defendants made clear that their opposition to consolidating these three new cases with the *Murray* cases was based on their desire to avoid conducting discovery about the individual plaintiffs (as contemplated by Phase I discovery in the *Murray* cases), and to stay focused on the admissibility of plaintiffs' expert testimony regarding general causation. *See supra* note 1. The cellphone defendants certainly did not agree to preserve the *Brooks* plaintiffs' ability either to conduct broad "general causation discovery" unrelated to expert admissibility or to present new expert testimony or reports, independent of and subsequent to the expert

admissibility litigation in the *Murray* cases. To the contrary, as memorialized in the joint stipulations signed in the months following the September 2012 hearing, the *Brooks* parties both agreed they would be bound by the *Murray* expert admissibility ruling and the case management rulings that led up to it.

Although the dissent determines, based on its reading of the record, that "the *Brooks* plaintiffs impliedly agreed to be bound by the rulings in *Murray* about the admissibility of expert witness causation testimony," *Post* at 59, it then attempts to distinguish between those rulings and "rulings that enforced the *Murray* case management order." *Id*. at 61. But tellingly, the *Brooks* plaintiffs have never sought to sort out the rulings leading up to the *Murray* cases' expert admissibility ruling that applied to them and those that did not—and for good reason. The record does not support such parsing. As discussed, the joint stipulations bound the *Brooks* parties to the procedural rulings preceding the expert admissibility determination in the *Murray* cases as a package. Nothing in their terms invites the line-drawing the dissent now attempts on the *Brooks* plaintiffs' behalf.

Lastly, because the dissent never examines the *Brooks* parties' joint stipulations, it never confronts the central problem that its reconstruction of the record presents: why would both parties agree to a heads-the-plaintiffs-win-tails-the-defendants-lose arrangement whereby the *Brooks* parties' cases would be stayed indefinitely for the *Murray* expert admissibility litigation but once that litigation was

over, the *Brooks* plaintiffs could engage in full discovery and take another run at admitting new experts or even the same experts based on new expert reports? The fact of the matter is that both the *Brooks* plaintiffs and the cellphone company defendants agreed that the expert admissibility ruling and predicate procedural rulings in the *Murray* cases would apply to the *Brooks* cases—i.e., that it would resolve whether the *Brooks* plaintiffs had admissible expert testimony in their cases—because each saw a possible strategic advantage to such an agreement. The plaintiffs hoped that this ruling would be the spearpoint of further discovery and litigation; the defendants hoped this ruling would be the immediate demise of both the *Murray* and the *Brooks* cases. To conclude otherwise, as the dissent does, strips the joint stipulations of all reasonable meaning.[21]

The dissent closes by suggesting, concededly without any factual foundation, that the cellphone companies may be harboring internal documents that show that their products do in fact cause cancer—much as tobacco companies did for decades—thereby thwarting scientific research that would prove their liability. *Id.*

---

[21] In a footnote, the dissent attempts to sidestep this illogic by asserting that the cellphone company "defendants were not counterparties to the *Brooks* plaintiffs' implied agreement" that the dissent (but not the *Brooks* plaintiffs themselves) claims the *Brooks* parties had *with the court*. *Post* at 60 note 9. But again, as the majority opinion explains and the dissent ignores, all but one of the *Brooks* parties had express, bilateral written agreements in the form of their joint stipulations (and we deem the one exception to have impliedly agreed to the same terms). *See supra* at Part II.A.

at 64-66. Building on this unfounded analogy, the dissent states, "even if it is still the case that no American court had accepted the theory that non-ionizing radiation from cellphones can cause the types of adverse health effects that the *Brooks* plaintiffs allege, that is not a reason to bind the *Brooks* plaintiffs to the outcome in *Murray*." *Id.* at 66. But of course, the majority opinion does not "bind the *Brooks* plaintiffs to the outcome in *Murray*" because of a lack of evidence or the novelty of their claims; it binds the *Brooks* plaintiffs to the outcome of the expert admissibility litigation in the *Murray* case, which this court upheld in *Motorola III*, because the *Brooks* plaintiffs agreed to be so bound.

*          *          *

For the reasons stated above, we conclude that the *Brooks* plaintiffs agreed to be bound by both the trial court's substantive ruling regarding whether the *Murray* plaintiffs had admissible expert testimony about general causation, and by all predicate procedural rulings. We discern no reason that the trial court should have declared these agreements nonbinding. And because the trial court determined in the *Murray* cases that the plaintiffs could not satisfy the admissibility standards of *Daubert*/Rule 702, we affirm the court's decision to grant the defendant cellphone companies summary judgment in the *Brooks* cases because the *Brooks* plaintiffs lacked the requisite expert testimony to prove their case.

*So ordered.*

## APPENDIX

## LIST OF COUNSEL

*Jesenka Mrdjenovic* argued for appellants. The following were on the brief: *Jeffrey B. Morganroth*, *Mayer Morganroth*, and *Cherie Morganroth*, Morganroth & Morganroth, PLLC; *James F. Green* and *Michelle A. Parfitt*, Ashcraft & Gerel LLP; *Hunter Lundy*, *Rudie R. Soileau, Jr.*, and *Kristie Hightower*, Lundy LLP; *Victor Pribanic*, Pribanic & Pribanic LLP; and *Steven R. Hickman*, Frasier, Frasier, & Hickman, LLP.

*Terrence Dee* argued for appellees. The following were on the brief: *Terrence Dee* (admitted pro hac vice), *Karalena G. Senese* (admitted pro hac vice), *Hannah Gallagher* (admitted pro hac vice), *Rand Brothers*, and *Dion J. Robbins* (admitted pro hac vice), counsel for Motorola Mobility LLC, Motorola Solutions, Inc. f/k/a Motorola Inc. and Motorola Inc.; *Kelley Connolly Barnaby*, *Scott A. Elder* (admitted pro hac vice), and *David Venderbush* (admitted pro hac vice), counsel for Cellco Partnership d/b/a Verizon Wireless; Bell Atlantic Mobile, Inc. formerly d/b/a Bell Atlantic Nynex Mobile; and Verizon Wireless Inc.; *Thomas C. Watson* and *Curtis S. Renner*, counsel for AT&T Inc., AT&T Wireless Services Inc., Cingular Wireless LLC, and related entities; *Seamus C. Duffy* (admitted pro hac vice), counsel for AT&T Inc., AT&T Wireless Services Inc., Cingular Wireless LLC, and related entities; *Jeffrey D. Skinner* and *Thomas M. Crispi*, counsel for Apple Inc.; *Paul J. Maloney*, *Matthew D. Berkowitz*, and *Kelly Cousoulis*, counsel for Audiovox Communications Corporation; *Howard D. Scher* (admitted pro hac vice), *Carrie G. Amezcua*, and *Andrew G. Hope*, counsel for Cellular One Group; *Michael D. McNeely* and *Vicki L. Dexter*, counsel for Cellular Telecommunications & Internet Association; *Eric M. Leppo*, counsel for Cricket Wireless, LLC and Sanyo North America Corporation n/k/a Panasonic Corporation of North America; *Matthew Wright*, counsel for Blackberry Corp. and HTC America, Inc.; *Matthew Wright*, counsel for HTC America, Inc.; *Brianna Lynn Silverstein*, counsel for HP Inc., successor in interest to Palm; *Sean M. Reilly*, counsel for LG Electronics MobileComm U.S.A., Inc.; *Mike Stenglein* (admitted pro hac vice), *Richard W.*

*Stimson* (admitted pro hac vice), *Lohr Beck* (admitted pro hac vice), *Steven M. Zager*, and *Erica Franzetti*, counsel for Microsoft Mobile Oy, successor in interest to Nokia, Inc.; *Stephen T. Fowler* and *Frank Citera* (admitted pro hac vice), counsel for Sony Electronics Inc.; *Jaime W. Luse*, counsel for Samsung Electronics America, Inc., the successor by merger to Samsung Telecommunications America, LLC; *Shannon Schoultz*, counsel for Sprint Nextel Corporation f/k/a Nextel Communications Sprint Spectrum, L.P. d/b/a Sprint PCS; *Ardelle M. Bahar* and *Renee B. Appel*, Counsel for Telecommunications Industry Association; *Michael Scoville*, *Daniel P. Ridlon* (admitted pro hac vice), and *Mary Rose Hughes*, counsel for T-Mobile USA, Inc. and Metro PCS Communications, Inc.; and *Elizabeth M. Chiarello* (admitted pro hac vice), *Frank R. Volpe*, and *Eugene A. Schoon* (admitted pro hac vice), counsel for United States Cellular Corporation.

THOMPSON, *Senior Judge*, dissenting: The opinion for the court concludes that "the *Brooks* plaintiffs agreed—either expressly or implicitly—to be bound by both the substantive outcome of the *Murray* litigation and all predicate procedural rulings." *Ante* at 3. The opinion thus upholds the Superior Court's summary judgment ruling that was to the same effect: that the *Brooks* plaintiffs were "bound by the substantive result in *Murray*" (a judgment in favor of the cellphone company defendants upon exclusion of all of the *Murray* plaintiffs' experts) and also "bound by the case management arrangements in *Murray*," such that the *Brooks* plaintiffs were "limited to the same roster of experts as the Murray plaintiffs" and "precluded from proffering other expert testimony in support of their claims."

For the reasons set out below, I am unable to agree with my colleagues' conclusion. I therefore respectfully dissent.

## I. The record does not support a determination that the *Brooks* plaintiffs were bound by the case management schedule, including the expert-designation deadline, in *Murray.*

Judge Burgess convened a hearing on September 20, 2012, that addressed the *Murray* plaintiffs' motion to compel and, after a recess, also served as the initial status hearing in the *Brooks* cases. Regarding the *Brooks* cases, Judge Burgess asked whether his order should say that the cases would "be joined" to the *Murray* cases "for case management purposes" and "go along with . . . what I schedule with respect to the rest of [the *Murray*] case[s][.]" Mr. Dee, counsel for one of the cellphone defendants, said, "I think we want to stay those three [*Brooks*] cases. I think that's what we talked about with the plaintiffs. We're not going to conduct any discovery" and "[w]e're not going to move forward in those cases. We're just going to keep them[.]"[1] Thereafter, Judge Burgess issued in each of the *Brooks* cases an order, the November 29, 2012, "Order Granting Stipulat[i]on and Proposed Case Management Order," drafted by the parties, that "stayed [each *Brooks* case] in its entirety pending the [c]ourt's resolution of the *Frye/Dyas* hearing" in the *Murray*

---

[1] As appellants have articulated it, the purpose of the proposed stay was "simply to avoid duplication of effort with respect to the general causation experts at issue in the *Murray* cases."

cases but also directed that "the [c]ourt's ruling in the *Frye/Dyas* hearing in the *Murray* cases will apply to this case."[2] Thus, the resolution of the September 20, 2012, status hearing was that the court and the parties understood that the *Brooks* plaintiffs were *not* joining the *Murray* cases for case management or scheduling purposes. The *Brooks* case were simply stayed, "in [their] entirety."[3] The *Brooks* cases were on no schedule or deadlines; and, in particular, the *Brooks* plaintiffs were not made subject to a deadline for designating experts.

In concluding—quite to the contrary—in his summary judgment ruling years later that the *Brooks* plaintiffs "are bound by the case management arrangements of the *Murray* cases such that [they] cannot now name new experts on the general causation question," Judge Irving quoted and emphasized comments by Mr. Morganroth, counsel for both the *Murray* and the *Brooks* plaintiffs, at the outset

---

[2] The November 29, 2012, order granted the stipulations and proposed order drafted by (and signed by each of) the *Brooks* parties. The "Parties agree that . . ." language of the stipulations was incorporated verbatim in the November 29, 2012, "Order Granting Stipulat[i]on . . ." that is a focus of my analysis in the text above.

[3] Staying an action in its entirety "stop[s] th[e] case dead in its tracks for an extended, indefinite period of time," *Prodoehl v. Strassner*, No. 07-0699-WS-B, 2008 U.S. Dist. LEXIS 52220, at *3 (S.D. Ala. July 8, 2008), "to include any pending deadlines, discovery, or other procedural elements[.]" *Carr Gottstein Props., L.P. v. Seritage Growth Props., L.P.*, No. 3:16-cv-00224-RRB, 2017 U.S. Dist. LEXIS 176867, at *4 (D. Alaska March 29, 2017).

of the September 20, 2012, hearing.[4] Mr. Morganroth told the court that the *Brooks* plaintiffs had "agreed to be bound by the phase one discovery in the cases that are currently pending [i.e., the *Murray* cases], as well as the *Frye* hearing, without upsetting the schedule, without adding anything." While that statement at first glance appears to support Judge Irving's ruling that the *Brooks* plaintiffs "are bound by the case management arrangements of the *Murray* cases," the discussion that followed during the September 20, 2012, hearing revealed the "disconnect" that underlay Mr. Morganroth's initial representation and shows why his statement did not actually reflect "the consent of the parties as expressed on the record at the status hearing[] on September 20, 2012," and was not a valid basis for Judge Irving's conclusion.

Addressing the *Murray* plaintiffs' motion to compel, Mr. Morganroth told the court that the cellphone company defendants were resisting the *Murray* plaintiffs' efforts to conduct discovery on the "general causation issue," which Mr. Morganroth identified as "whether cellphone radiation can cause the types of adverse health effects that the plaintiffs have alleged." Mr. Morganroth reminded Judge Burgess, the then-presiding judge, that the December 7, 2011, case management order in

---

[4] The November 29, 2012, "Order Granting Stipulat[i]on and Proposed Case Management Order" in the *Brooks* cases states that it was "in accordance with the consent of the parties as expressed on the record at the status hearing[] on September 20, 2012," so it is important to look to what the parties' counsel expressed during that status hearing.

*Murray* (the "*Murray* case management order"), which had been drafted by the parties after a November 15, 2011, case management conference and which was a "stipulated order," had set a "deadline for fact discovery . . . related to general causation," with "the only qualification [being] that all such discovery shall be initiated sufficiently in advance in order to be completed by th[e specified] date" and with "no other qualification, restriction or limitation[.]"

Judge Burgess's comments that followed made it clear that he had not intended the *Murray* case management order to permit, in Phase I, fact discovery that was as broad as Mr. Morganroth was describing. Rather, Judge Burgess indicated, he intended that Phase I discovery in *Murray* would be directed narrowly at whether plaintiffs' designated experts used a generally accepted methodology in reaching their conclusions. Importantly, Mr. Morganroth's response to that clarification was that the *Murray* plaintiffs "wouldn't have stipulated to [the *Murray* case management] order" if he had understood that the court did not intend to allow, in Phase I, general fact discovery about "cause and effect," i.e., about whether cell phones cause injury. Mr. Morganroth explained that the fact discovery the *Murray* plaintiffs sought—and had understood the *Murray* case management order to permit as part of Phase I—included, inter alia, discovery of the defendants' internal test data, internal communications and disclosures to insurers that might contain statements against interest, defendant-sponsored research studies that were

terminated or not completed, and subpoenas to third-party scientists about relevant research, material that Mr. Morganroth said plaintiffs' experts would want to consider in preparing their opinions.[5]

Judge Burgess confirmed that a limited first-round of discovery ("first stage[] discovery aimed toward a *Frye* hearing") had indeed been his intent in issuing the *Murray* case management order. Judge Burgess agreed with Mr. Morganroth, however, that there had been a "disconnect in terms of the terminology" regarding what the court and counsel for the *Murray* plaintiffs understood to fall within the "general causation" Phase I discovery that the *Murray* case management order allowed. Judge Burgess acknowledged that his remarks during the November 15,

_____

[5] Mr. Morganroth explained:

> [A] careful expert would say, all right, I want to see all the data, I want to see if there's anything else out there that I should be considering or not considering. I want to make sure that these studies that I'm relying upon, the methodologies are sound, so if there's anything out there that I don't know, I want to know. I want to know if there was any biases there or influence or manipulation.
> I want to know if you can get me more information on how the cellphone actually emits the radiation or exposes the individuals, if there were protective devices that were supposedly to protect and limit the radiation, why were they doing that, what were the dangers, risks. Those are the things, one expert can be an engineer just specifically on that topic. So you wouldn't just present a general causation expert opinion without having the opportunity to conduct discovery . . . . [O]ur expert[s] should have the full story before they have to give an opinion . . . .

2011, hearing "may have. . . confused things," and he told the parties that he would "take a lot of the blame for [the court and the parties having] spent a certain amount of time here using words that we're not comfortable with together."[6]

In summary, the foregoing background indicates the following: the *Brooks* plaintiffs, through counsel, expressed a willingness, as the September 20, 2012, hearing commenced, "to be bound by the phase one discovery" in *Murray*, "without upsetting the schedule" and "without adding anything." But the record also contains the representation by their counsel (again, the same lawyer who represented the *Murray* plaintiffs), made after Judge Burgess clarified the limitations on the fact discovery he was allowing during first phase of discovery in *Murray*, that counsel would *not* have agreed on behalf of the *Murray* plaintiffs to a limited first-phase discovery that precluded discovery of the defendants' internal test data and communications.

Given this background, I believe the record provides no basis for concluding that counsel knowingly agreed on behalf of the *Brooks* plaintiffs to that same limited

---

[6] Judge Burgess added, "let's put the word general causation out, except insofar as it is defined as I put it. General causation is[,] do the . . . plaintiffs satisfy *Frye* [i.e., the then-governing standard for admission of expert testimony in the District of Columbia]." That appears to be the sense in which counsel for the *Murray* and *Brooks* plaintiffs, who also represented a group of non*Murray*, non*Brooks* plaintiffs, used the term "general causation" when they later told Judge Josey-Herring that that group of plaintiffs would "be bound by the general causation outcome in the *Murray* cases."

initial-phase discovery, notwithstanding counsel's remarks at the outset of the September 20, 2012, hearing. At the very least, the record precludes any conclusion that the circumstances were the "plainest circumstances" that could permit an inference of an implied agreement by the *Brooks* plaintiffs to be bound by the Murray case management order and schedule. *See Cannon v. Armstrong Containers Inc.*, 92 F.4th 688, 709 (7th Cir. 2024) (quoting Restatement (Second) of Judgments § 40 (1982) ("While a party may agree to refrain from exercising his right to a day in court in return for being spared the burden of active litigation, no such agreement should be inferred except upon the plainest circumstances.")).

Based on all the foregoing, I am persuaded by appellants' arguments (which the majority opinion appears to have overlooked) that they did not explicitly agree "to forgo general causation discovery of their own, much less to be bound by the *Murray* plaintiffs' case management schedule," that they "'were not bound to the deadlines in the *Murray* [c]ases,'" and that they were "'not bound to use the same experts.'"[7] I would hold that the Superior Court should not have entered summary

---

[7] These are the same arguments the *Brooks* plaintiffs made in July 2021, when they joined in a motion by other non*Murray* plaintiffs to lift the stays of their cases. They reminded the court that there had been "[n]o case management conferences or scheduling orders entered in [their] cases" and "[n]o deadlines ha[d] been set at all," and they asserted repeatedly that they had never "agreed to be limited to naming just those same general causation experts who were named on February 1, 2013 in the *Murray* [c]ases" and that "[a]t no time did any of the parties in the [n]on-[c]onsolidated [c]ases agree that they could not name additional or different or

judgment against the *Brooks* plaintiffs on the ground that they had no admissible expert testimony without their having been afforded an opportunity to conduct their own fact discovery and to designate their own experts.

## II. The record does not support a determination that the *Brooks* plaintiffs impliedly agreed to be bound by the ultimate outcome in *Murray*.

The *Brooks* plaintiffs agreed, and Judge Burgess's *Brooks* case management order provided, that "the court's ruling in the *Frye*/*Dyas* hearing in the *Murray* Cases will apply to this case."[8] However, after the interlocutory appeal of Judge Weisberg's

---

updated experts, conduct additional or different or updated discovery regarding scientific evidence, or rely upon additional or different or supplemental expert reports."

[8] Despite the clear import of this sentence (especially its lead, "The *Brooks* plaintiffs *agreed* . . ."), the majority opinion chides me for purportedly "look[ing] everywhere but to the . . . joint stipulations" in which the *Brooks* plaintiffs "committed to be bound by the outcome of the expert admissibility litigation in the *Murray* cases and by the case management orders leading up to it." *Ante* at 40. But the problem with looking to those stipulations to resolve this case, as my colleagues do, is twofold: (i) the stipulations say nothing about the *Brooks* plaintiffs being bound by (or "joined with," as Judge Burgess suggested at first) the *Murray* case management orders, and instead state expressly that the *Brooks* cases were to be stayed in their entirety; and (ii) each stipulation was that the Superior Court's ruling "in the *Frye/Dyas* hearing" in the *Murray* cases would apply. The majority opinion is forced to undertake a lengthy explanation to get to the conclusion that, by signing the stipulations, the *Brooks* plaintiffs agreed to be subject to the case management schedule the court had imposed in *Murray* and to be bound by the conclusion of the *Daubert*/FRE 702 hearing. The language of the stipulations, and of the November 29, 2012, "Order Granting Stipulat[i]on and Proposed Case Management Order" reflecting the stipulations, simply does not support the majority's atextual argument.

An additional problem with the majority's reliance on the stipulations regarding the *Frye/Dyas* hearing is this: During the September 20 hearing, Mr. Dee

*Frye/Dyas* ruling, he issued a January 2015 order in *DeRosa*, another case filed after the *Murray* and *Brooks* cases, staying the new case and directing that "the court's rulings on the admissibility of expert witness testimony on general causation in the *Murray* Cases, following remand . . . will apply to this case, *as it will apply to all related cases pursuant to prior orders of this court*" (italics added). That italicized language in Judge Weisberg's order plainly implied that the Superior Court's admissibility-of-expert-witness-testimony rulings in *Murray*, based on whatever standard would apply upon remand from this court, would apply to the *Brooks* cases as well. No objection to the order was lodged on behalf of the *Brooks* plaintiffs even though they had earlier explicitly agreed only that the Superior Court's "ruling in the *Frye*/*Dyas* hearing in the *Murray* cases w[ould] apply" to their cases. Further, in 2017, when Judge Josey-Herring issued a number of sua sponte orders in then-

---

said, "I can tell [Mr. Morganroth that] if he survives *Frye*, then he's going to get discovery of us on that other stuff that he says he needs now. . . . [I]f he were to survive *Frye*, then that general causation discovery he's talking about would be available to him." Judge Burgess gave a similar assurance, saying that "if you pass *Frye*, . . . you get much fuller discovery of the defendants" and that discovery on general causation would be "the next part of the process." The majority does not explain why, despite the foregoing context for their stipulations to be bound by the ruling in the *Frye/Dyas* hearing, the *Brooks* plaintiffs "could not have reasonably thought," *ante* at 43, that they were entitled to additional discovery, or why it was fair for the *Brooks* plaintiffs to have had judgment entered against them when they never had the opportunity to conduct the additional fact discovery that the defendants and the court had agreed would be available if (as occurred) the *Murray* plaintiffs "pass[ed] *Frye*."

recently filed additional non*Murray*, non*Brooks* cases, she stated in those orders that the trial court's "ruling [under *Daubert/*Rule 702] on the admissibility of expert witness testimony on general causation in the *Murray* Cases, will apply to this case, *as it will apply to all related cases pursuant to prior orders of this court*" (italics added). Again, no objection was made to that language on behalf of the *Brooks* plaintiffs. In light of the foregoing, I agree with the opinion for the court that the *Brooks* plaintiffs must be deemed to have impliedly agreed that they would be bound by the rulings on admissibility of expert witness causation testimony in the *Murray* cases (and not bound by just the rulings applying *Frye/Dyas*).

But what does it mean that the *Brooks* plaintiffs impliedly agreed to be bound by the rulings in *Murray* about the admissibility of expert witness causation testimony (i.e., agreed that "the court's rulings on the admissibility of expert witness testimony on general causation in the *Murray* Cases . . . will apply")?

Interpretation of an agreement "begins with the language of the [agreement] itself," and we may look to the "context to determine what a reasonable person in the shoes of the parties making the agreement would have thought its language meant," *Jabbour v. Bassatne*, 673 A.2d 201, 203 (D.C. 1996) (internal quotation marks omitted)), presuming that the reasonable person "know[s] all the circumstances before and contemporaneous with the making of the agreement," *Patterson v. District of Columbia*, 795 A.2d 681, 683 (D.C. 2002) (internal quotation

marks omitted). Here, the full circumstances of the *Brooks* plaintiffs' implied agreement that "the court's rulings on the admissibility of expert witness testimony on general causation in the *Murray* Cases . . . will apply" included knowledge that Judge Burgess had stayed the *Brooks* cases in their entirety without joining them to the *Murray* cases "for case management purposes" and without having them "go along with" the schedule for the *Murray* cases. Therefore, notwithstanding what any party might prefer the *Brooks* plaintiffs' implied agreement to mean, a reasonable person would not have thought that the *Brooks* plaintiffs agreed to be bound by rulings in *Murray* that were not rulings on "admissibility of expert witness causation testimony" under *Daubert/*Rule 702.[9]

Prior to Judge Irving's April 25, 2023, rulings in *Murray* on the admissibility of the proffered expert causation testimony under *Daubert/*Rule 702, the judges who

---

[9] It might be argued that the cellphone company defendants would never have agreed to such a limited meaning of the *Brooks* plaintiffs' implied agreement that "the court's rulings on the admissibility of expert witness testimony on general causation in the *Murray* Cases . . . will apply." The answer to that argument is that the defendants were not counterparties to the *Brooks* plaintiffs' *implied* agreement. *See* Appellants' Reply Br. at 13 note 11 ("[T]he . . . language on which Defendants rely was . . . added by the court, not agreed by the parties."); *see also* Restatement (Second) of Judgments, § 40 (Reporter's Notes) ("Arrangements under which the resolution of issues in a pending action will be treated as determinative in parallel litigation may, however, be reached not only through bilateral agreement of the parties *but also through agreement involving the court itself, often as a concomitant of a ruling by the court concerning consolidation or severance of cases or trial schedules*." (italics added)).

presided seriatim (Judges Weisberg, Josey-Herring and Irving) made a number of rulings pertaining to the *Murray* plaintiffs' experts that were *not* "rulings on the admissibility of expert witness testimony on general causation," but instead were rulings that enforced the *Murray* case management order (an order to which the *Brooks* plaintiffs were not subject, as discussed above). For example, in a March 2017 post-remand order, Judge Weisberg determined that the *Murray* plaintiffs were not entitled to designate new experts, a ruling that he made based on the fact that, under the *Murray* case management order, the *Murray* plaintiffs had been required, by specified dates, to complete discovery and "to produce *all* of their experts on general causation, with a report from each expert setting forth 'a complete statement of all opinions the witness will express on general causation and the basis and reasons for them.'" In August 2018, Judge Josey-Herring struck portions of the *Murray* plaintiffs' experts' supplemental reports (e.g., designated experts' citations to pre-2013 studies cited for the first time in the supplemental reports and references to post-2013 science that was outside the scope of the experts' original reports) on the ground that the *Murray* case management order directed that the experts provide a complete statement of their opinions in their original reports. And, in April 2021, Judge Irving rejected the *Murray* plaintiffs' request to add as an expert Dr. Christopher Portier, who "would opine that 'the human epidemiology evidence on an association between cell phone use and the risk of glioma and acoustic

neuroma in adults is strong.'" In so ruling, Judge Irving echoed Judge Weisberg's reliance on the *Murray* case management order.

As for the April 25, 2023, order excluding all of the *Murray* plaintiffs' expert testimony, that was indeed a ruling that the testimony that the designated experts were permitted to present, in accordance with the expert-report deadline established by the *Murray* case management order, did not meet the *Daubert/*Rule 702 standard for admissibility of expert testimony. In other words, the April 25, 2023, order did consist of "rulings on the admissibility of expert witness testimony on general causation in the *Murray* [c]ases," such that it applied to the *Brooks* cases so as to preclude the *Brooks* plaintiffs from presenting that same testimony. But, importantly, the April 25, 2023, ruling was *not* a ruling that there can be no relevant and reliable, and therefore admissible, testimony that cellphone radiation causes brain tumors.[10]

---

[10] That is, in determining that the testimony of the *Murray* plaintiffs' experts was inadmissible, Judge Irving did not find that good science would not permit a conclusion that cellphone radiation can cause brain tumors. Rather, Judge Irving found that Dr. Kundi had failed to explain through specific studies and data why incidence data of glioma and acoustic neuromas have not increased over time, failed to provide sufficient facts and data to support his opinions, and relied upon studies that suffered from bias without explaining how he ruled out that bias. Judge Irving found that Dr. Belyaev failed to provide a causation opinion as to acoustic neuroma and glioma to a reasonable degree of scientific certainty and thus did not provide a causation opinion that "fits this case," and also failed to reliably apply the IARC methodology in that he "did no analysis of bias, confounding, or chance, and did not perform a dose-response analysis of the epidemiological data." Judge Irving found that Dr. Mosgoeller was "not able to say that exposure to cell phone radiation causes an increased risk of glioma or acoustic neuroma specifically" and did not reliably

Therefore, in my view, the Superior Court erred in ruling that the April 25, 2023, exclusion of the *Murray* plaintiffs' expert testimony meant that the *Brooks* plaintiffs are "precluded from proffering other expert testimony in support of their claims."[11]

Thus, for example, in my view, the *Brooks* plaintiffs' agreement that the rulings on expert testimony admissibility in *Murray* would apply should not have

---

apply the weight-of-the-evidence methodology to his literature review. Judge Irving found that Dr. Liboff's biological plausibility opinion was not "relevant to the general causation question" because he did not "offer an opinion on whether cell phones cause or promote glioma, acoustic neuroma, or any other type of tumor." Judge Irving found that Dr. Panagopoulos did not explain "how his research and experiments on fruit flies can be directly extrapolated to humans and how the effects on the fruit flies tie to cancer generally or brain cancer, and specifically gliomas or acoustic neuromas in humans." Finally, Judge Irving found that the opinions of "support witness" Dr. Plunkett, who "by herself, does not offer a general causation opinion that cell phone radiation causes glioma or acoustic neuroma," were not relevant once the court had excluded the *Murray* plaintiffs' other experts.

[11] In granting summary judgment in favor of the cellphone company defendants, Judge Irving reasoned that the *Brooks* plaintiffs' argument that they "are not bound by the substantive result in the Murray cases . . . ignore[s] the lack of any timely action seeking to lift the stay orders or unbind the[ir] cases in the face of significant and likely adverse developments in the *Murray* cases." But it is not difficult to understand why counsel who would be busy with the appeal in the *Murray* cases would be satisfied with an ongoing stay in the *Brooks* cases that would relieve counsel of having to litigate on two fronts. As the Restatement (Second) of Judgments recognizes, an agreement to be bound "cannot properly be inferred simply from the fact that the party in question . . . acquiesced in a . . . schedule designed to accommodate other related litigation." Restatement (Second) of Judgments, § 40 (Reporter's Notes); *see also id.*, comment a (explaining that the inference is improper because "the trial of an action may be postponed until after that in a related proceeding simply for convenience"). Any doubt about the scope of the *Brooks* plaintiffs' agreement to be bound "should be resolved against imposing preclusion." *Id.*

precluded the *Brooks* plaintiffs from presenting the expert testimony of Dr. Portier, whose testimony was not deemed inadmissible under *Daubert* and FRE 702, but instead was disallowed in the *Murray* cases because the *Murray* plaintiffs had not timely designated Dr. Portier and timely submitted a summary of his opinion in accordance with the schedule imposed under the *Murray* case management order. I also see no reason why the *Brooks* plaintiffs should be precluded from designating and presenting to a jury the same experts who were designated in *Murray* if those experts were to submit, according to case management schedules to be established in the *Brooks* cases, revised reports that the Superior Court determines satisfy the *Daubert/*FRE 702 admissibility standard. That is, I agree with the *Brooks* plaintiffs' argument that the fate of their cases was not tethered to the inadmissible, "heavily stricken expert reports of the *Murray* plaintiffs' experts based on a scheduling order issued in 2013 in the *Murray* cases only."

\*　　　\*　　　\*

An additional observation: the opinion for the court refers to Judge Weisberg's explanation in his March 2017 post-remand order in *Murray* that "the original 'case management orders were driven by the reality that no American court had ever accepted the theory that . . . radiation from cellphones could cause [the sorts of adverse health effects the *Murray* plaintiffs alleged and that] it was unfair to force [d]efendants to defend such complex and expensive litigation unless Plaintiffs could

present admissible expert testimony on general causation.'" *Ante* at 18-19. Judge Weisberg's remark is reminiscent of the litigation record in cases brought against tobacco companies by plaintiffs who alleged injuries to their health from cigarette smoking. *See, e.g.*, *In re Tobacco Litig.*, No. SX-20-MC-090, 2023 V.I. LEXIS 62, at \*16, 19 (V.I. Super. Dec. 29, 2023) (referring to allegations that "tobacco companies won every suit between the 1950s and 1990s because tobacco plaintiffs did not have tobacco companies' internal documents showing their fraud and conspiracy" and that "since the year 2000, plaintiffs won two thirds of the cases because they obtained access to, and used, the tobacco documents."); *see also In re Simon II Litig.*, 2002 U.S. Dist. LEXIS 25632, at \*53 (E.D.N.Y. Oct. 22, 2002) (stating that "internal documents from the defendants' own scientists suggest[] that they possessed significant proof of the causal relationship between smoking and disease, contradicting their denials" and noting "[t]he incongruity between defendants' public statements and internal documents lasted from the 1950s into the late 1990s"). Some of the tobacco plaintiffs claimed that the defendant cigarette companies had suppressed research showing the injurious health effects of their products, and, after years of litigation losses, some of the plaintiffs were eventually able to prevail after obtaining internal tobacco company documents showing that the companies were aware of and accepted the link between their products and smokers' health problems. *See, e.g., Greene v. Philip Morris USA Inc.*, 208 N.E.3d 676, 870

(Mass. 2023) ("For decades, the cigarette companies continued to publicly deny that smoking caused cancer . . . , even as their internal documents showed otherwise.").

The *Brooks* plaintiffs similarly allege that defendants have suppressed and discouraged research concerning the effects of radiation on cellphone users and have prevented funding to replicate studies that have shown adverse findings. That allegation may or may not be true; I have no basis for knowing. The point I would make, however, is that even if it is still the case that no American court has accepted the theory that non-ionizing radiation from cellphones can cause the types of adverse health effects that the *Brooks* plaintiffs allege, that is not a reason to bind the *Brooks* plaintiffs to the outcome in *Murray*—a result reached without the plaintiffs having had discovery of the defendants' internal documents, and with the *Brooks* plaintiffs having been precluded from relying on science deemed to be beyond the type of data that the *Murray* experts relied on for their reports prepared in 2013, even though the *Brooks* plaintiffs were not subject to the *Murray* expert-report-disclosure schedule.